# **Exhibit 2**

Emergency Motion to Dissolve
TRO in the E.D. Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS, SHERMAN DIVISION

BUNDREN LAW GROUP, PLLC,

        *Plaintiff,*

    vs.

ATLANTIC SPECIALTY INSURANCE COMPANY
ET. AL,

        *Defendants.*

CASE NO. 4:24-CV-00900-ALM

---

## EMERGENCY MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

---

In accordance with Federal Rule of Civil Procedure 65(b)(4), Defendant TGP Communications, LLC, ("TGP") moves this Court to dissolve the TRO (ECF No. 6). If the TRO is not dissolved before October 19, 2024, Defendant's will be in breach of a settlement agreement and will be irreparably harmed making proceeding under LR CV-7(e) inadequate.

### 1. INTRODUCTION

At the TRO hearing, the Court did not have the benefit of briefing by TGP, and, in that absence, the Court erred as to irreparable harm and could not properly analyze the merits. Bundren was retained to represent TGP in *Freeman, et al. v. Hoft, et al.,* (the "Freeman Moss lawsuit") and submitted fraudulent invoices for nearly $600,000. *See* **Exhibit 1**, Declaration of Jonathan Burns at ¶ 4. The Court should not allow Bundren's misconduct to irreparably harm his own client.

#### 1.1.    Chronology of the Dispute

On January 10, 2024, TGP retained Bundren as counsel in the Freeman Moss lawsuit.

On September 27, 2024, TGP filed a complaint challenging Bundren's fraudulent bills ($90,000 of which had already been paid) in the Eastern District of Missouri. *See* **Exhibit 3**. On

September 29, 2024, a settlement was reached in the Freeman Moss lawsuit. *See* **Exhibit 4**. This settlement would not have been possible had TGP known that $600,000 of its funds would be frozen. While Bundren represented to the Court at the October 11, 2024, hearing that he "had withdrawn," his motion to withdraw has not yet been granted. *See id*. Thus, he remains engaged as Defendants' counsel in that action. A first-filed suit against Bundren in the Eastern District of Missouri is pending. *See* Burns Decl. at ¶ 8.

### 1.1.1. Bundren's Fraudulent Billing

The following evidence of improper billing practices and fraud appears from a review of Bundren's invoices:

i)   Bundren's motion for admission *pro hac vice* was filed on Jan. 15, 2024 and he was not admitted until Jan. 24, 2024. Yet, be charged nearly $1,400 in expenses, and at least 12 hours in mostly travel time ($6,900), for a routine scheduling hearing on Jan. 17, 2024, at which he had *no role.* Bundren had 51 pages of billing entries before his admission and 34 pages of entries before his *pro hac vice* application was filed. Burns Decl. at ¶ 9.

ii)   From Nov. 6, 2023, to Jan. 31, 2024, Bundren billed 157.40 hours ($90,505.00). From Jan. 9, 2024, to Feb. 24, 2024, Bundren billed 237.60 hours ($136,620.00). From March 1, 2024, to March 30, 2024, Bundren billed 318.30 hours ($183,022.50). If those bills are to be believed, Bundren himself worked 10.6 hours every single day of the month of March, *including* weekends. Had he only worked weekdays that month, it would be an unsustainable 16 hours a day. TGP did not see any evidence in Bundren's work product or communications indicating that he was putting in 16 hour workdays. Nor was that necessary. These numbers indicate nothing short of fraud. From April 1, 2024, to April 30, 2024, Bundren billed an additional 177.80 hours ($102,235.00). In sum, that is 733.70 hours from January 9, 2024, to April 30, 2024 ($421,877.50) for Bundren alone, not

including paralegal time. There were only nine significant events during that period—in addition to the 1/17 hearing, there were depositions scheduled for 1/26, 2/13 & 22, & 3/8, hearings on 2/22 & 3/11, and remote conferences on 3/8 & 21 and 4/12. Burns Decl. at ¶ 10.

iii)     In contrast, for that same period, TGP's other outside counsel, Randazza Legal Group, PLLC, billed 340.40 hours *for the entire firm* for their significant substantive work including attending depositions and writing all significant substantive motions and oppositions and handling hearings effectively as lead counsel. Discovery responses were handled by the Randazza firm. Deposition preparation was handled by the Randazza firm. Burns Decl. at ¶ 11.

iv)     Numerous billing entries reflect excess time. As an example, the second entry of January 25, 2024—Bundren billed 0.2 hours to review and save a 3-line order granting *pro hac vice* admission. Time involved downloading and saving is a task that should have been performed by a paralegal at a lower rate. Bundren's bills are replete with entries where all of the work should have been done by a paralegal for downloading electronic copies of emails and documents. Burns Decl. at ¶ 12.

v)     On December 12, 2023, Bundren billed 4.60 hours, more than a month before seeking admission, to review the Second Amended Petition and 16 exhibits, despite having spent only 1.70 no-charge hours the prior day reviewing the original petition and the insurance policy. It should not take nearly three times the effort to review the Second Amended Petition than the original. Similarly, Bundren billed 1.6 hours on February 25, 2024, and another 1.3 hours on February 26, 2024, for review and revisions to objections to two additional requests for production, adding a short standard objection that was copied across all responses. Burns Decl. at ¶ 13.

vi)     In March 2024, with no actual depositions, one perfunctory hearing, and two remote special master conferences, Attorney Bundren billed 318.30 hours (average of 79.575 hours/week). On

March 9, he billed 4.8 hours for legal research on a motion *that had already been filed* and which was met with very little caselaw in opposition, with another 5.3 hours on March 10. On March 17, he billed 2.2 hours for review of the draft opposition to the fifth motion to compel, with another 1.7 hours on March 18, yet the Microsoft Word metadata timestamps on the edits only evidence *14 total minutes of editing* on March 18 (and he billed 0.5 hours for the transmission email that would only have taken a 0.1 to draft). Some of his most excessive billing that month was with respect to 3rd party subpoenas. On March 20 alone he spent 6.7 hours in "final preparation" of subpoenas *drafted by other counsel*, which contained overlapping language. Burns Decl. at ¶ 14.

vii)     Between April 3rd through 10th, Bundren billed 7.7 hours revising a Georgia Petition in Aid of Discovery. The entire petition was 9 pages, with *the first 5 pages being an identification of parties*. Burns Decl. at ¶ 15.

viii)     The invoices contain numerous 0.2 entries for reviewing and downloading routine and short documents. E.g., Attorney Bundren billed a 0.2 on Feb. 20, 2024, for reviewing an e-mail from co-counsel that said only: "Will do." Burns Decl. at ¶ 16.

ix)     TGP filed a bankruptcy petition on April 24, 2024, and Bundren indicated as much in a 0.4 call with local counsel in Georgia, directing him to cease working in light of the automatic bankruptcy stay.[1] Yet, Bundren then continued to churn the file, unlawfully billing 16.4 hours of from April 25-30, despite the automatic stay. Burns Decl. at ¶ 17.

In sum, the unpaid invoices submitted by Bundren, the basis for this Court's TRO, are fraudulent. Bundren does not attest to the bills' veracity, only that he submitted them.

---

[1] Notwithstanding the petition, TGP is a going concern, and the bankruptcy court found that "TGP is currently able to pay its operating debts in the ordinary course of its business." *In re TGP Commc'ns, LLC*, No. 24-13938-MAM, 2024 Bankr. LEXIS 1715, at *4 (Bankr. S.D. Fla. July 24, 2024).

## 2.  LEGAL STANDARD

Injunctive relief "is an extraordinary remedy and should not issue except upon a clear showing of possible irreparable injury." *Lewis v. S.S. Baune*, 534 F.2d 1115, 1121 (5th Cir. 1976). "A Rule 65(b)(4) motion to dissolve is treated like a motion for reconsideration and should be granted where the TRO was improperly issued. Accordingly, the court can dissolve the TRO if the party who obtained it did not show a substantial likelihood of success on the merits, if the TRO was not issued in accordance with applicable procedural law, or otherwise improperly issued." *Myers v. Frontier PMS*, 2021 U.S. Dist. LEXIS 128847, at *15 (E.D. Tex. June 15, 2021). The Supreme Court has set forth the requirements that must be shown before a party will be entitled to relief; a plaintiff must establish that (1) he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The mover bears the burden of persuasion of each requirement. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). Where the movant (Bundren) seeks to alter the status quo as opposed to preserve it, a preliminary injunction is "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Pham v. Univ. of Louisiana at Monroe*, 194 F. Supp. 3d 534, 543 (W.D. La. 2016).

## 3.  ARGUMENTS AND AUTHORITIES

### 3.1.  Bundren will Suffer No Irreparable Harm

Bundren seeks only money damages, which are not irreparable harm. A harm "is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). The possibility that "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a

claim of irreparable injury." *Dennis Melancon, Inc. v. City of New Orleans*, 704 F.3d 262, 279 (5th Cir. 2012). Only where the monetary remedy is especially difficult to quantify, the injury can be labeled as irreparable. *See Rutherford v. Pruvit Ventures, Inc.*, Civil Action No. 4:24-CV-561, 2024 U.S. Dist. LEXIS 165252, at *7-8 (E.D. Tex. Sep. 13, 2024) (Mazzant, U.S.D.J.) (citing *ICEE Distribs., Inc. v. J&J Snack Foods Corp.*, 325 F.3d 586, 596-97 (5th Cir. 2003)). Here, Bundren has precisely quantified the monetary remedy he seeks—less than the amount he has frozen with the improperly granted TRO (he seeks $512,000 but has frozen $600,000, with no explanation as to the additional $88,000).

A plaintiff must also demonstrate more than the *mere possibility* of irreparable harm; he must show irreparable harm is *likely*. *Winter*, 555 U.S. at 19-22 (emphasis added). Bundren's motion for the temporary restraining order was not supported by any evidence of irreparable harm and Bundren's affidavit in support of his motion—the sole evidence he submitted—did not even mention irreparable harm. *See* Bundren Aff. ECF. No. 4-1.

TGP is able to pay its bills; it has documented revenue of $3M per year, or $250,000 per month. *See* **Exhibit 6**. Thus, even if the insurance funds were depleted a TRO is improper. Moreover, the mere possibility that Defendants may not have funds available to later satisfy a judgment does not amount to irreparable harm. *PBR Sales, LLC v. Pezco Int'l, LLC*, No. 21-22909, 2022 U.S. Dist. LEXIS 36804, at *16-17 (S.D. Fla. Mar. 1, 2022). Indeed, in the *PBR Sales* case, the court held that "[w]hether or not an adequate remedy at law exists depends upon whether a judgment can be obtained, not whether, once obtained, it will be collectible."

Bundren's request to hold these funds underscores that his harm can "be undone through monetary remedies." *Deerfield Med. Ctr.*, 661 F.2d 328 at 338. This is consistent with *Rutherford, supra* (preliminary injunction seeking commissions denied as harm was repairable despite interim

financial harm, including risk of homelessness). Why is Bundren so privileged that waiting until judgment is a harm greater than homelessness? All Bundren is complaining about is a possible delay in payment, not that he won't ever get paid. *Connecticut Mun. Elec. Energy Coop.*, 2022 U.S. Dist. LEXIS 154794 at*5 ("Absent some indication that failure to receive any remaining payments before a final judgment is entered will result in some harm beyond the mere delay in payment, [the insured] has failed to establish that its injury cannot be compensated by monetary damages."). Bundren suffers the same delay whether he must await payment by TGP or upon the completion of this suit.

Bundren protected its legal rights by bringing the original claim before the Court and can be remedied through having the matter fully litigated. *Wade v. Chase Bank USA, N.A.*, No. 2:12-cv-03565-RMG, 2013 U.S. Dist. LEXIS 197001, at *5 (D.S.C. Sep. 18, 2013)(denying injunction). Bundren failed the second prong of the *Winter* text.

### 3.2. Bundren's Failure on the Merits

At no point in Bundren's motion did he argue why he is likely to succeed on the merits and no specific findings have been made. The state court complaint (ECF No. 1-1), repleaded (ECF No. 7), pleads three counts—a) breach of contract; b) promissory estoppel, and c) third-party beneficiary. (ECF No. 4). Bundren lacks a likelihood of success, let alone a substantial one, on any of them.

Here, the fraud outlined above not only negates the likelihood of success on the merits factor, it means Plaintiff has unclean hands and is not eligible for equitable relief. Under Texas law, "a party seeking an equitable remedy must do equity and come to court with clean hands." *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). The unclean hands doctrine applies against a litigant whose own conduct "in connection with the same matter or transaction has been unconscientious, unjust, marked by a want of good faith, or violates the principles of equity and righteous dealing." *Flores v. Flores*, 116 S.W.3d 870, 876 (Tex. App.—Corpus Christi-Edinburg 2003, no pet.).

Here, Bundren's billing practices are the core matter in dispute, and they are as dirty as billing records can be. While there are times when an attorney may need to bill 16 hour days—such as jury trials with post-trial day briefing—those days are rare and are not sustained for weeks, let alone months at a time. There is no evidence that 16 hour days were required of Bundren, and no evidence that he actually worked those hours. Moreover, this was not the only case in which Bundren was involved in as an attorney or *litigant* during that time. A cursory search of LexisNexis database turns up several cases in which Bundren was actively litigating during this same time period

### 3.2.1.  Breach of Contract

Bundren failed to demonstrate a breach of contract. The elements of a breach of contract claim under Texas law are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Intern., Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007).

First, breaching a contract requires the formation of a contract, and no contract ever existed between the insurance companies and Bundren. Bundren offers no evidence of such. And, Bundren is not a party to the insurance agreement.[2] *See* **Exhibit 7**. In fact, the insurance company explicitly declined to execute Bundren's retainer. *See* **Exhibit 8**. The only contract with Bundren as a party was the retainer. *See* **Exhibit 2**. Only TGP Communications, James Hoft, Joe Hoft, are recipients of, and signatories to, the retainer agreement. *Id.*

Bundren cannot sue upon the Insurance Policy for, as the Court previously observed, "no person can sue upon a contract except . . . he in privity with it." *Lamar Cty. Elec. Coop. Ass'n v. McInnis*

---

[2] Bundren's Complaint at ECF No. 7, ¶ 52, refers to both an insurance contract and an Insurance Policy, but the only insurance contract is the Insurance Policy. *See* Burns Decl. at ¶¶ 18-19.

*Bros. Constr., Inc.*, Civil Action No. 4:20-CV-930, 2021 U.S. Dist. LEXIS 51869 at *10 (E.D. Tex. Mar. 19, 2021) (Mazzant, U.S.D.J.) *The insurance company never hired Bundren*, and there was never privity of contract between Bundren and the insurance company. Instead, TGP hired Bundren, and the insurance company, in its policy with TGP, agreed to pay "reasonable and necessary legal fees" within the policy. **Exhibit 7**. Thus, the insurance companies could not have breached any agreement with Bundren.

Moreover, the duty of the insurance company is to insureds. The primary obligation is to pay up to the limits of the policy, whether for indemnity or defense. The policy does not prioritize defense costs over indemnity, and, as discussed below, equity dictates that the proceeds should favor the insured's underlying settlement. *See Gabarick v. Laurin Mar. (America) Inc.*, 635 F. Supp. 2d 499, 509 (E.D. La. 2009) ("To the extent that the priority of claims is not controlled by policy language or controlling law, determination of priority of claims 'is neither a conclusion of law nor a factual finding, but is, instead, an equitable decision.'") *quoting Marine Indem. Ins. Co. of America v. Lockwood Warehouse and Storage*, 115 F.3d 282, 287 (5th Cir 1997). In any defense of an insured with a depleting policy, there is always the possibility of exhaustion, at which point the insurance company has no further duty. *See, e.g., McGrath v. Chesapeake Bay Diving*, No. 06-11413, 2010 U.S. Dist. LEXIS 2776, at *12 n.3 (E.D. La. Jan. 14, 2010) ("where the limits of an eroding policy are exhausted, the duty to defend expires"). Any experienced lawyer would know this. At the rate he was billing, Bundren knew the insurance policy would be depleted well before trial. And, TGP would have to pay. **Exhibit 2**.

Bundren can show no breach of the retainer agreement. TGP and the Hofts are only obliged to pay after the insurance companies have made their determination as to what fees, if any, are

reasonable. Further, they have the right to determine reasonableness themselves. In the underlying case, the insurer had already committed to paying the policy limits. *See* **Exhibit 9**. Thus, even if the insurer takes the position that the fees are reasonable, the insurer has no "skin in the game." Fraudulent fees are not reasonable, and Bundren's fees are fraudulent.

To that end, Bundren cannot prove damages. Bundren states by his own admission that he submitted invoices to the insurance companies, TGP, Jim Hoft, and Joe Hoft. (ECF. No. 1-1 and ECF No. 7), but did not submit these invoices to the Court or otherwise validate the $512,000 claim.

Invoices are not sufficient to prove damages. As acknowledged by this Court, a plaintiff cannot simply give a damages amount without supporting documentation. *Murphy v. ABA Ranch, LLC*, Civil Action No. 4:17-CV-00215, 2018 U.S. Dist. LEXIS 129978 at *13 (E.D. Tex. Aug. 2, 2018). Notably, Bundren is seeking attorneys' fees for work in Missouri. Attorneys typically establish the number of hours expended through the presentation of adequately recorded time records as evidence. *Murphy* at 18; *see also Riley v. City of Jackson, Miss.*, 99 F.3d 757, 760 (5th Cir. 1996); *La. Power & Light Co. v. KellStrom*, 50 F.3d 319, 324 (5th Cir. 1995); *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). Bundren cannot supply it non-fraudulently. A truthful affidavit by Attorney Bundren would belie his invoices and show he violated his duty to not charge unreasonable fees.[3]

Due to Bundren's lack of privity of contract with the insurance companies and his inability to prove his fraudulently claimed damages, Bundren is unlikely to succeed on his contract claim.

### 3.2.2. Promissory Estoppel

Bundren is not likely to succeed on promissory estoppel. Bundren must prove four elements:

---

[3] Rules Governing the Missouri Bar and the Judiciary. § 4-1.5 (Plaintiff represented a Missouri client in a Missouri matter); *see also* Texas Disciplinary Rules of Professional Conduct. § 1.04(a).

(1) a promise (2) that the promisor should have expected would lead the promisee to some definite and substantial injury, (3) that such an injury occurred, and (4) that injustice that may be remedied only by enforcing the promise. *Nagle v. Nagle*, 633 S.W.2d 796, 800 (Tex. 1982). In Texas, a promissory estoppel claim is limited to cases where the promise was "to sign a written agreement which itself complies with the Statute of Frauds." *Id.*

Bundren identifies no promises made other than the Insurance Policy and the representation agreement. The insurance companies made no promises to Bundren, and Bundren had no reason to believe there was a promise. As noted above, the insurance company explicitly refused to enter into an agreement with Bundren. And, as stated in the retainer agreement, Bundren's invoices were to be directed to TGP, not the insurance companies. The only promise Bundren references is a promise between TGP and Bundren to pay legal fees. Bundren had no reason to solely rely on the insurance. *See* **Exhibit 2**.

Bundren also has suffered no definite and substantial injury. As stated above, the insurance policy being depleted does not mean that Bundren will have no recourse. TGP has income and revenue and will be able to pay Bundren's compensation claim if lawful. Bundren has already been partially paid on his bills and unpaid fraudulent invoices are not evidence of injury. Based on Bundren's inability to prove a promise to which he was a party, detrimental reliance, and injury, he fails on his promissory estoppel claim.

### 3.2.3.  Third-Party Beneficiary

Bundren is not a third-party beneficiary of the Insurance Policy. A third-party beneficiary claim requires as follows:

> As a general rule, the benefits and burdens of a contract belong solely to the contracting parties, and no person can sue upon a contract except he be a party to or in privity with it. An exception to this general rule permits a person who is not a

party to the contract to sue for damages caused by its breach if the person qualifies as a third-party beneficiary. Absent a statutory or other legal rule to the contrary, a person's status as a third-party beneficiary depends solely on the contracting parties' intent. Specifically, a person seeking to establish third-party-beneficiary status must demonstrate that the contracting parties intended to secure a benefit to that third party and entered into the contract directly for the third party's benefit. It is not enough that the third party would benefit—whether directly or indirectly—from the parties' performance, or that the parties knew that the third party would benefit. Nor does it matter that the third party intended or expected to benefit from the contract, for only the intention of the contracting parties in this respect is of controlling importance. To create a third-party beneficiary, the contracting parties must have intended to grant the third party the right to be a "claimant" in the event of a breach.

*First Bank v. Brumitt*, 519 S.W.3d 95 (Tex. 2017)(internal quotations and citation omitted). Bundren fails to meet these requirements. As this Court has noted, there is a presumption *against* third-party beneficiary status, and to overcome this presumption, a party must establish that the contracting parties "intended to secure a benefit to that third party" and that they "entered into the contract for the third party's benefit." *Ruff v. Ruff*, 2023 U.S. Dist. LEXIS 98426 at *19 (E.D. Tex. June 6, 2023)(Mazzant, U.S.D.J.). Bundren is not mentioned in the Policy. Bundren is not an insured. The Policy predates Bundren's relationship with TGP, and, thus, his services could not have been contemplated at that time. There is no evidence either of them intended to benefit Bundren at that time. The Policy contains no "sufficiently clear and unequivocal language demonstrating" that TGP and the insurance company intended for Bundren to directly benefit. *Tawes v. Barnes*, 340 S.W.3d 419 at 428. Thus, his claim fails. Moreover, as noted above, there has been no breach and Bundren's fraud does not constitute an injury.

### 3.2.4.  Status Quo

Bundren seeks to alter the pre-suit status quo, countervailing against the TRO. The status quo is allowing the settlement to proceed and the Freeman Moss lawsuit to resolve and close. The funds were intended to indemnify and settle TGP's case and not be converted into a pre-judgment

attached fund, held for no other reason than to let Bundren hold complete destruction over his clients' head in order to extort payment of his fraudulent claim on his timetable. As shown above, the facts and the law do not favor Bundren, and he does not come to the Court with clean hands, so the status quo should be preserved, not flipped over on its head by an injunction that conflicts with all other known cases addressing similar issues.

### 3.3. Balance of Equities

The balance of the equities favors TGP. The Freeman Moss lawsuit has been resolved to the mutual satisfaction of the parties through a fair and reasonable settlement, including monetary terms that exceed the full amount of TGP's remaining insurance proceeds. TGP and Jim Hoft are due to make a payment from those proceeds by October 20, 2024. If TGP is unable to meet its obligations, the consequences will end TGP as an ongoing concern. *See* Burns Decl. at ¶ 20. This avoided TGP facing a potential $150 million judgment. *Compare Freeman v. Giuliani*, 2023 U.S. Dist. LEXIS 235560 (D.D.C. Dec. 18, 2023) (awarding judgment against Mayor Giuliani in favor these same individuals); *Freeman v. Giuliani*, 2024 U.S. Dist. LEXIS 67783, at *51-52 (D.D.C. Apr. 15, 2024)(addressing Giuliani's arguments that TGP, not him, caused the alleged damages). On the other hand, Bundren would merely need to wait until his fee entitlement has been adjudicated.

The balance of equities in requesting a preliminary injunction stopping an insurance payout was analyzed in *Wade v. Chase Bank USA, N.A.*, No. 2:12-cv-03565-RMG, 2013 U.S. Dist. LEXIS 197001, at *5 (D.S.C. Sep. 18, 2013). In *Wade*, the balance of equities did not tip in the plaintiffs' favor as Chase had "had an unconditional right to receive insurance proceeds from State Farm upon the date of loss" and that it was "equitable for Chase to have use of [the insurance] proceeds until Plaintiffs' claims are resolved." *Id.* at 5. Here, Bundren does not have an unconditional right to the proceeds. Thus, it is equitable for TGP to have the use of the proceeds to pay the settlement.

At the TRO hearing, the Court raised questions about TGP's cash flow and how it interacts with this case. Bundren seemed to believe that if TGP did not have the money on hand to pay the settlement, that would mean that TGP would not have the money to pay Bundren. As this was a non-evidentiary proceeding, Bundren allowed the Court to be misled. To be clear, TGP earns roughly $250,000 per month, and it has the capacity to satisfy a judgment for $512,000 in approximately 10 weeks' time. That does not mean that it has funds on hand to comply with the terms of the Giuliani-catastrophe-avoiding settlement agreement with Moss/Freeman as required. If the settlement falls apart because of Bundren's TRO, TGP is exposed to significant harms. Accordingly, the TRO destroys TGP for nothing more than Bundren's convenience or his tactical decision to extort a settlement from them. This alone should result in a vacatur of the TRO.

### 3.4.    Public Interest

The public interest favors TGP. First, there is significant "overriding" public interest effectuating settlements. *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1976); *see also Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) ("It hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation.")); *Bradley v. Sebelius*, 621 F.3d 1330, 1339 (11th Cir. 2010). And there is substantial public interest in ensuring lawyers abide the rules of practice, which Bundren has failed to do.

Bundren demonstrated a lack of candor with this tribunal when he made a false statement of material fact to the Court when he stated he had withdrawn from the Freeman Moss lawsuit. He has not withdrawn—rather he has merely requested to withdraw. But the court has not yet granted his motion. *See* **Exhibit 5**. Texas Disciplinary Rules of Professional Conduct. § 3.03(a)(3) specifically addresses conduct in ex parte proceedings: "A lawyer shall not . . . in an ex parte proceeding, fail to disclose to the tribunal an unprivileged fact which the lawyer reasonably believes should be known

by that entity for it to make an informed decision." Here, Bundren should have disclosed the fact that he was still the "attorney in charge and lead attorney." *See* Bundren Aff. at ¶ 4, ECF No. 4-1. This distinction is highly relevant because Bundren's actions represent a severe conflict of interest and violation of his duty of loyalty to his clients. See Texas Disciplinary Rules of Professional Conduct. § 1.06, Comment 4.[4] Here, this conflict of interest forecloses the Defendants' ability to comply with the settlement agreement that is currently in place.

An attorney also has a duty to act in a client's best interest, and to avoid a conflict with those interests.[5] Yet, in tying up the funds TGP needs to fulfill its duties to Freeman and Hoft, Bundren is sabotaging a settlement agreement that was both hotly contested and difficult to achieve in the matter in which Bundren represented TGP. Bundren is also mishandling his client's property by attempting to push TGP into insolvency via default on the settlement agreement.[6] Thus, none of the four factors warranted entry of the TRO.

Bundren is also charging an unreasonable fee, violating Rule 1.04 of the Texas Disciplinary Rules of Professional Conduct, and Rule 4-1.5(a) of the Missouri Rules of Professional Conduct. So severe are violations of this rule that a fraudulent billing of $21,000 can necessitate a two-year suspension under Rule 4-1.5 analogs and related rules. *See, e.g., Disciplinary Counsel v. Smith*, 2017-Ohio-9087, 152 Ohio St. 3d 337, 96 N.E.3d 234 (2017). Here, Bundren's fraud appears to be in the hundreds of thousands of dollars.

---

[4] "Loyalty to a client is impaired not only by the representation of opposing parties in situations . . .  but also in any situation when a lawyer may not be able to consider, recommend or carry out an appropriate course of action for one client because of the lawyer's own interests or responsibilities to others. The conflict in effect forecloses alternatives that would otherwise be available to the client."

[5] Rules Governing the Missouri Bar and the Judiciary. § 4-1.7.

[6] Rules Governing the Missouri Bar and the Judiciary. § 4-1.15 *see also* Texas Disciplinary Rules of Professional Conduct. § 1.14.

Dated: October 16, 2024

Respectfully Submitted,

/s/ Brian Casper
Darin M. Klemchuk
State Bar No. 24002418
darin.klemchuk@klemchuk.com
Brian Casper
State Bar No. 24075563
brian.casper@klemchuk.com
Mandi M. Phillips
State Bar No. 24036117
mandi.phillips@klemchuk.com
KLEMCHUK PLLC
8150 N. Central Expressway, 10th Floor
Dallas, Texas 75206
(214) 367-6000 – Direct
(214) 367-6001 – Fax

ATTORNEYS FOR DEFENDANT
TGP COMMUNICATIONS, LLC

## CERTIFICATE OF CONFERENCE

On October 15, 2024, I spoke with Charles Bundren, counsel for the Plaintiff, on the phone about the substance of this motion in accordance with the requirement in Local Rule CV-7(h), and he indicated that Plaintiff was opposed to the motion. No agreement could be reached over the underlying controversy. Our discussions conclusively ended in an impasse, leaving an open issue for the court to resolve.

/s/ Brian Casper
Brian Casper


## CERTIFICATE OF SERVICE

This document was filed and served via the Court's CM/ECF system on all counsel of record on the date noted above, and will be served on all other Defendants by U.S. mail, postage prepaid, as follows:

Atlantic Specialty Insurance Company
150 Royal St.
Canton, MA 02021

One Beacon Professional Insurance Group
6800 College Blvd., Suite 350
Overland Park, Kansas 66211

One Beacon Professional Insurance, Inc.
6800 College Blvd., Suite 350
Overland Park, Kansas 66211

Intact Insurance Group, USA, LLC
605 Highway 169 N, Suite 800
Plymouth, MN 55441

James "Jim" Hoft
1820 NE Jensen Beach Blvd., Suite 1120
Jensen Beach, FL 34957

Joe Hoft
1820 NE Jensen Beach Blvd., Suite 1120
Jensen Beach, FL 34957

/s/ Brian Casper
Brian Casper